IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

*FILED*
*2018 JAN 16 PM 2: 55*

K.N, individually and on behalf
of A.M, a minor,

      Plaintiffs,

CASE NO.: 3:18-cv-102-J-20JBT

v.

DUVAL COUNTY SCHOOL BOARD,

      Defendant.

_____/

## COMPLAINT FOR INJUNCTIVE RELIEF AND JURY DEMAND

COME NOW the plaintiff, K.N., individually and on behalf of A.M.., a minor, by and through the undersigned counsel and sues the DUVAL COUNTY SCHOOL BOARD, and hereby alleges as follows:

### PARTIES

1. The plaintiff, K.N, in an individual, *sui juris*, who resided in Duval County, Florida, at all times relevant.

2. The plaintiff, A.M.., is a minor who has resided in Duval County, Florida, at all times relevant.

3. The Defendant, DUVAL COUNTY SCHOOL BOARD, ("Board" or "District") is a corporate and governmental agency duly empowered by the constitution and statutes of the state of Florida to administer, manage, and operate the Duval County Public Schools ("DCPS.")

K.N, individually and on behalf of A.M v. DUVAL COUNTY SCHOOL BOARD,
COMPLAINT
Page 2 of 34

4. The District receives state and federal funding for the education of children with disabilities. The Board meets the definition of a public entity under 42 U.S.C. § 12131.

## JURISDICTION AND VENUE

5. Jurisdiction for this action vests pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) based upon claims brought under the Individuals with Disabilities Act, 20 U.S.C. § 1400 et seq. ("IDEA"), 42 U.S.C. § 12131 for claims brought under the Americans with Disabilities Act of 1990; 29 U.S.C. § 794, for claims brought under Section 504 of the Rehabilitation Act of 1973 and 42 U.S.C. §§ 1983 and 1988 for violations of K.N., and .A.M.'s civil rights; and the District Court's pendent jurisdiction over the state claims alleged, which arise out of the same operative facts and circumstances.

6. Venue for this action lies pursuant to 28 U.S.C. § 1391(b) in that the Board resides in the judicial district and the cause of action accrued in the judicial district.

## GENERAL ALLEGATIONS

7. A.M. is currently a nine year old boy in second grade.

8. DCPS receives state and federal funding for education.

9. K.N. is the mother ("parent") of A.M.

10. When A.M. was four years old, due to behavioral issues, A.M. was referred to Hope Haven Children's Clinic and Family Center (Hope) for counseling services. While at Hope, he received counseling services and was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) and Oppositional Defiant Disorder (ODD). A.M.

voluntarily attended pre-kindergarten at Hope. During that time, A.M. was on several medications related to his ADHD and ODD.

11. A.M. started kindergarten at Sabal Palm Elementary ("SPES") in August 2015.

12. SPES is a public elementary school in Duval Country.

13. Approximately two weeks before school starting, K.N. advised the Principal, Linda Graham, of A.M,'s disabilities.  She advised Ms. Graham that A.M had some difficulty communicating, that there were questions as to whether A.M. was on the autism spectrum and that they would need to start the process of getting an IEP. Notwithstanding this notice, Principal Graham did not attempt to obtain any special services for A.M.

14. The information provided by K.N. put Ms. Graham and the District on notice that they had an obligation under Child Find to act.

15. School districts have the responsibility to ensure that students suspected of having a disability are subject to general education intervention procedures. They must ensure that all students are identified, located, and evaluated, and a free appropriate public education (FAPE) is made available to them. 6A-6.0331, F.A.C.; 34 C.F.R. § 300.111(c)(1).

16. Upon receiving information from K.N., the District was required to put supports into place and evaluate A.M. without delay.

17. Prior to the start of Kindergarten, K.N. admitted A.M. to the Mental Health Resource Center due to an increase in aggressive behavior against her. A.M. remained in the facility from August 21 through 23, 2015, and therefore, missed the first day of school.

During the course of his admission, he received a diagnosis of Disruptive Mood Dysregulation Disorder (DMDD), and his medications were changed.

18. During Kindergarten orientation, K.N., met with Ms. Joni Hancock, the Kindergarten teacher, and advised her of the hospitalization and the behavioral difficulties.

19. K.N. also requested an IEP and exceptional student education (ESE) services from the guidance counselor at school as A.M. had been hospitalized and that he had ADHD and DMDD.

20. The guidance counselor, Chris Malewicki, stated that the school policy was to allow the teachers at least nine weeks to see how the kids are doing and that the (teacher or school) has to do RTI before they can start the process of evaluating for an IEP.

21. RTI however cannot be used to delay the evaluation process. 6A-6.0331(3)(b) & 1(f).

22. An RTI process does not replace the need for a comprehensive evaluation, and the results of an RTI process may be one component of the information reviewed as part of the evaluation procedures required under 34 CFR §§300.304 and 330.305. Ltr. to Dr. Zirkel, 47 IDELR ¶ 268 (OSEP Mar. 6, 2007)

23. Notwithstanding A.M.'s disability and history of disability, A.M.'s Kindergarten teacher, Ms. Hancock, did not request an evaluation or otherwise begin the identification process. Ms. Hancock had never heard of Disturbed Mood Dysregulation Disorder before and did not understand what she was to do. The district did not provide any training or support to Ms. Hancock.   Ms. Hancock's need for assistance and support became clear immediately as did A.M.'s need for ESE services and supports.

24. On August 31, 2015, A.M. was referred by Ms. Hancock to the guidance counselor, Ms. Mondestin-Hillman. Ms. Mondestin-Hillman provided several Simon Says videos to A.M. over the course of the month regarding keeping his hands to himself. She also did daily "check-ins" with A.M. in the morning. Ms. Mondestin-Hillman did not request an evaluation or otherwise begin the identification process.

25. Notwithstanding the clear notice of disability, from August 31, 2015 to September 14, 2015, A.M. received no support or services from the district and the evaluation and identification process was not begun. A.M.'s disabilities were interfering with his ability to access his education. His known problem behaviors were increasing. The district removed A.M. from class for these problem behaviors rather than provide A.M. the proper supports and interventions the school is required to provide. A.M.'s problem behaviors were significant and clear and included the following: hitting a girl, fighting, pinching a boy, scribbling on 3 people's paper, calling people names, scratched a boy's cheek, squeezing a boy's face, calling a boy names, making fart noises, not keeping hands to self, pushing in line, punching people in their chest, touching and pulling on others during carpet time, pushing on playground, hitting girl with toy, making loud fart noises during center time, pulling a girl down, stepped on girl's fingers, scribbled on work, scrunched paper of classmate, poured water on a boy's chips, slapped a girl's face and then hit her in the back of the head so hard her head went forward.

26. The District had an obligation to investigate why the student was having so many problem behaviors. The investigation would include not only evaluations but also the use a functional behavior assessment (FBA) to determine when and why problem

behaviors were occurring and the development of a behavior intervention plan (BIP) to address the problem behaviors. Data should have been collected to determine if there were any patterns to the behavior or antecedents that could be identified. A FBA and BIP can be implemented without a formal determination of eligibility for ESE services, without an individualized education plan (IEP) or 504 plan. Supports and accommodations could have also been put into place without a formal determination of eligibility and before evaluations were completed. In addition, the classroom teacher could have requested addition supports and been provided with additional training. Staff with specialized training could have been brought into the classroom to work with the student or the teaching staff. An assistant or aide could have been utilized to assist the student and/or the classroom teacher.

27. Instead, on September 14, 2015, a Multi-Disciplinary Referral Team (MRT) meeting was held at SPES with the Guidance Counselor, Chris Malewicki, the School Psychologist, Melissa Grunthal, A.M.'s parents and the kindergarten teacher Joni Hancock. At this meeting, behaviors were discussed but the parents were not asked to sign consents for evaluations, no evaluations were requested and the identification process was not otherwise started. No formal supports like a BIP were put into place or utilized. Instead the district denied the parents request for testing and issued a written notice of refusal.

28. Despite the clear need, no evaluations were requested, no additional supports were put into place for the teacher or the student and this student was allowed to continue to struggle behaviorally. During this time, A.M. was not accessing his education.

29. The parents continued to request meetings and support. On December 7, 2015, another meeting was held at the request of the father. At this meeting, T.M., the father, was asked to and did sign a consent for the school to conduct a Functional Behavior Assessment (FBA). Despite an anecdotal log of behaviors, no plan was created. Instead, DCPS determined that appropriate general education interventions had been implemented, screenings and observations completed, and that evaluation for ESE eligibility was not recommended, notwithstanding the continuous behavioral problems. Instead, DCPS decided to collect more data and utilized a behavior tracking sheet to monitor three targeted behaviors: keeping hands and feet to self, disruption, and hurting others.

30. Between August 2015 and December 2015, A.M. received three disciplinary referrals for behaviors that were a clear manifestation of his disability. Rather than address the disability, A.M. was disciplined.

31. Discipline is not an appropriate intervention for problem behaviors. As a result of the referrals, A.M. was removed from the classroom and placed in time out in the school office. Removing the student from the classroom is not an appropriate intervention and did nothing to reduce the problem behaviors. If anything removal from the classroom reinforced the problem behaviors since it allowed A.M. to escape and avoid the classroom, which is why he was misbehaving. Every time A.M. was removed from the classroom he was not receiving direct instruction from his teacher. A.M.'s behaviors and removals from the classroom were interfering with his ability to access his education.

32. The anecdotal log kept by Ms. Hancock identified the problem behaviors. There was no need to collect more data. The need for evaluations, supports and services was clear. Aggression, property destruction, and disruptive noises were identified every day the child was in school. [1]

33. Because no supports or services were provided to A.M., behaviors only escalated and instead of evaluating this student, the district continued to discipline him for known problem behaviors. From January to March, 2016, A.M received numerous

---

[1] The following is a brief summary of the behaviors recorded between the Notice of Refusal for testing and the second request for testing: 9/15 "poured water onto a boy's chips at lunch; slapped a girl's face in the line for dismissal the slapped the back of her head so hard that her head went forward; 9/18 grabbed a boy's arm and snatched a game piece out of boy's hand; hurt boy and made him cry; punched boy in nose later on carpet during group time; kicking and punching girl in back on carpet; saying silly words to make children laugh; 9/22 punched boy in back while in line; hit boy in nose with ice pack while at lunch; punched boy on playground in his arm; 9/25 pushed and kicked girl in line; scratched boy on playground and left marks; pinned boy down on carpet; cut another child's paper; 9/28 will not keep hands off other child on carpet; hit boy in cafeteria refused to move away; hit boy on playground with long grass root would not give teacher long root; he was sent to time out and he refused to comply continued to eat snack ignored all adults; hit a girl and kicked her when she walked by; in dismissal line spitting on boy; 9/29 needs to keep hand and feet to self; 9/30 making sill noises copying what teacher says, blurted out 'Play with your penis!' Two week period with warnings about keeping hands and feet to self (10/1 to 10/12); 10/13 silly noises hands on others; 10/14 silly noises, hands on others; 10/15 silly noises; 10/19 hands on others; 10/22, hurting others, kicking on playground; 10/23 hands on others not following directions,; 10/26 throwing chairs, spinning scissors (needed office assistance), 10/27 yelled in line, grabbing toys, pushed boy hurt others (called office for help); 10/28 tickling a girl down back of her underpants, kicked a boy, pushing others in line; 11/2 pushing boy at top of slide, rammed his head so hard in chest made boy cry, constant silly noise in classroom during instruction, 11/3 screaming in bathroom, rough on playground; 11/4 hit boy in head with scissors then tried to cut his own shirt screaming in cafeteria, play fighting on playground; 11/5 making noises and not staying in seat, disruptive; 11/6 not keeping hands and feet to self, disruptive noises; 11/9, hands and feet on others disruptive noises; 11/12 field trip hands on other children, threw acorn at cow, elbowed girl made her cry, kicked pony; 11/13 kicked boy making noises in time out, throwing water in cafeteria, grabbing and hitting in line back from cafeteria, threw sand in boys' faces, calling people names; 11/16 kicking and hitting on playground; 11/23 making silly noises hands and feet on others,;12/3 and 12/4 hands and feet on others during the day."

disciplinary referrals for punching a student in the face, throwing sand in one student's eye and slapping another, and punching a student in the stomach; hitting a student in the hand with a puzzle piece and jerking another student out of her chair; hitting and punching a student in the head and stomach; and hitting a student in the face and stomach and splitting her lip for not "following his jacket rules;" scratching three girls in the face and hitting a fourth girl in the lip; and head butting a student for trying to sit in the adjacent seat.

34. The FBA was completed in April 2017 - four months after the second request for testing occurred in December, 2016, and seven months after a notice of refusal for testing was generated and the commitment to begin RTI was discussed. No BIP however was created. The data from the FBA revealed that the interventions being used were not effective or successful. This is confirmed by the increase of problem behaviors and the continued use of referrals to address these behaviors. Removals from the classroom and disciplinary referrals were also not effective in reducing the problem behaviors.

35. The interventions which were tried but which failed included the following:

a. Greeting A.M. in the morning and verbally reminding A.M. of the expectation for the day and to remind A.M. of his cool down choices.

b. Generative a chart that had "cool down choices."

c. A.M. was allowed to change his seating if he became agitated.

d. Ms. Hancock purchased a rocker seat so he "did not have to sit still.

e. Classroom rules were posted such as "Be quiet as a mouse" "Listen with your rabbit ears"

f.    If a rule was broken Ms. Hancock would remind the student of the rule.

g.    If the student continued to break the rule, a card would be flipped.

h.    If the student could keep the card on "white" he/she would receive a "warm fuzzy" (pipe cleaner).

i.    Five warm fuzzies led to a trip to the treasure box, which occurred every two weeks

j.    The students would receive daily notes home, which were initialed and sent back.

36. Ms. Hancock explained that none of these "interventions appeared to- really matter if he was in one of those moods….It did not matter what you did."

37. There was no data collected on if the interventions were being implemented with fidelity.

38. Ms. Hancock would call the office for help. Ms. Hancock would remove the class from the room and either she or an administrator would stay with the A.M. Ms. Hancock would phone A.M.'s parents to have them talk with him to try to calm him. Sometimes A.M.'s parents would come and sit with A.M. in class. Sometimes the school would call and A.M. would have to leave early because of behavior. A.M.'s mother usually would stay with him until he calmed and then leave him for the rest of the school day, but A.M. was suspended a few times and a few times A.M's mother had to take him home early, which is tantamount to an out of school suspension. During all this time, A.M. was not accessing his education. Every time he was removed from the classroom, suspended or picked up early from school, he was not receiving direct instruction from his classroom teachers.

39. Rather than evaluate or put more supports into place for the teacher, including a classroom aide, or additional training for the teacher; or bring in staff with specialized training to assist the teacher or the student or put supports in for the student including an appropriate behavior plan, counseling, appropriate accommodations for both academic and behavioral needs, a sensory diet, occupational therapy, language therapy, and the like, the school continued to remove the student and use discipline to address the problem behaviors.

40. A.M. had spoken with the Guidance Counselor, Ms. Malewicki, and again stated A.M.'s need for a behaviorist to address problem behaviors, and was advised that the District does not use behaviorists or provide ABA (Applied Behavioral Analysis) therapy unless the child is severely Autistic. K.N. was further advised that he was headed towards a self-controlled, segregated, behavioral support setting if the behaviors continued. Rather than request testing or provide the appropriate supports, the school threatened to remove the student to a more restrictive placement.

41. In April 2016, A.M. continued to receive disciplinary referrals for hitting a student with a toy, after previously hitting the same student in the stomach; poking two students with a pencil; making disruptive noises; calling children's names and silly or nasty words; and engaging in property destruction.

42. On May 9, 2016, Petitioner was disciplined for banging his chair loudly on the floor after being redirected, hitting tables with a 2 x 4 block, throwing chairs, and throwing a tray at Ms. Hancock and plates at the computer screen.

43. On that day, K.N. spoke with Principal Graham and was advised that if there was a time where the school personnel was not able to gain control over A.M., and the parents could not be reached, that the school would call the crisis team to Baker Act (involuntary commit) A.M. into a psychiatric facility.

44. Between December 2015 and May 2016, seventeen forms titled "disciplinary referrals" were prepared regarding events on seventeen different dates.  No evaluations were recommended, no meetings were held, no changes were made to the behavior plan such as it was, no additional supports or services were put into place. The child was removed from the classroom, disciplined without regard for his disabilities and was not accessing his education.

45. A.M. also participated in the Extended Day Program.  During the entire school year, he did not have any significant behavioral issues until approximately April 2016, when the daytime behavioral issues were inadequately addressed.  It is suspected that because the aftercare program did not put any academic demands on A.M. he was able to function successfully in the program.  This further establishes the need for evaluations to determine what if any academic deficits existed and what antecedents could be identified so that proper supports could be put into place and the problem behaviors could be properly addressed and reduced and eventually eliminated.

46. On May 10, 2016, Ms. Hancock had enough, and complained to Principal Graham that A.M.'s behavior is "such that other children in the class are at risk of injury…and to accept this a formal request for immediate corrective action to protect our children and this child. A special needs provision needs to be made immediately."

47. On June 6, 2016, Ms. Hancock again emailed Principal Graham and provided as follows: "I am writing to let you know that I refuse to have [Petitioner] in my class for the rest of the school year. [He] is very disruptive and constantly threatening and hurting other children and me. It is not a safe learning environment with [Petitioner] in my classroom. For the safety and protection of the students and myself I am requesting that [he] not be allowed back in my class."

48. Fearing for his safety and having concerns that his teacher was refusing to educate A.M. and did not want him in her classroom, A.M.'s parents kept A.M. at home for the remainder of the Kindergarten school year.

49. The school did not request any evaluations or provide any support or educational services for the remainder of the school year.

50. K.N. wanted A.M. to go to the District summer program but due to behavioral issues and the lack of support, he was expelled from the program in less than one week. Even with this expulsion, no evaluations were requested by the District.

51. Over the summer, K.N. requested copies of the evaluations, but only received the gifted testing, and was told that the remainder of the evaluations would be given to them in September for the IEP meeting.  No further evaluations were requested of A.M., no summer school was provided and nothing was done to address the needs of the student or prepare him for the following school year.

52. Despite the amount of the time out of the classroom and despite the amount of direct instruction missed and despite there being no improvement in the problem behaviors, A.M. was promoted to the 1st grade for the 2016- 2017 school year.

K.N, individually and on behalf of A.M v. DUVAL COUNTY SCHOOL BOARD,
COMPLAINT
Page 14 of 34

53. In August 2016, A.M. began first grade at Sabal Palm in Ms. Jeanne Sharpe's inclusion class.

54. In August 2016, just prior to school starting, a BIP developed by Beverly McGuire, other DCPS team members and with information from the parents was provided to the parents. Beverly McGuire did not meet with or otherwise observe the Petitioner prior to the development of the BIP because school had not started yet and she had no opportunity during the 2016-2017 school year to observe. At the time of the BIP development, Beverly McGuire was not a Board Certified Behavior Analyst (BCBA). The school did not have a BCBA observe A.M. or consult with the team prior to September 2016.

55. On August 15 and August 16, 2016, Beverly McGuire conducted two modeling sessions for the teachers at SPES. The interventions that were put in place consisted of a check in check out sheet, break (alone time) cards, and sticker sheet. These interventions were considered RTI/MTSS and are reflected as such on the FBA conducted September 29, 2016.

56. Notwithstanding the obvious disability related behaviors, DCPS continued to refuse to have an IEP or 504 plan for A.M., never requested any evaluations and did not provide any additional support or training to the staff and no additional support or related services to the student.

57. Reporting on the individual behavior sheets indicate data collection of two known problem behaviors - lack of compliance and aggression. During August 2016, A.M. was signed out of class early several days and was physically restrained by the principal

where he was scratched and bruised. Following the restraint incident, A.M. received two more referrals in August resulting in four days of out of school suspension.

58. On September 6, 2016, on A. M.'s first day back at school after the suspension, A.M. eloped into the courtyard. A.M. was standing on tables and banging on windows to classrooms.

59. .After A.M. eloped into the library. DCPS school personnel called the Duval County Crisis Hotline and it was determined that Child Guidance Center would be contacted by the DCSB Crisis Hotline personnel. The purpose of calling the hotline is to have the child removed from the school and involuntarily committed into a hospital because the child is in danger of hurting himself or others. In Florida, involuntary commitment is known as the Baker Act. A.M.'s father, T.M. was contacted at some point by phone regarding A.M.'s behavior, but A.M. would not speak to his father on the phone. The parents were not told that the school was attempting to Baker Act their son.

60. The rapid responder's personnel told school personnel to wait on contacting A.M.'s parents regarding the involvement of the Crisis Intervention Team and the Child Guidance Center.

61. The purpose of attempting to Baker Act A.M. was to remove A.M. from the school rather than properly address his needs or provide him with the appropriate support and services. When a problem student is removed from the school through the Baker Act, the removal is not reported as a suspension or arrest from school. In Florida, the Baker Act is often used to remove students from school rather than an arrest from school which needs to be disclosed.

62. DCPS has a policy and customarily uses involuntary commitment instead of providing the necessary de-escalation techniques in its schools.

63. During the 2013-14 school year, DCPS involuntarily committed 142 children. The number rose to 167 during the 2014-15 year. Last school year 126 children were involuntarily committed to psychiatric wards.

64. Two weeks prior to A.M.'s institutionalization, a former lieutenant in the Duval School Board Police Department disclosed that there is a practice at DCPS to involuntary commit children to deal with problem students.

65. At no time during A.M.'s behavioral episode were the criteria for involuntary commitment met.

   a.    There was no danger of A.M. suffering from neglect or refuse to care for himself or herself;

   b.    There was no substantial likelihood that in the near future, that six-year-old A.M. was going to inflict serious bodily harm on himself or others, as evidenced by recent behavior causing, attempting, or threatening such harm; and

   c.    No less restrictive treatment alternatives that would offer an opportunity for improvement of A.M.'s condition even were attempted or considered.

66. The "danger" was that A.M. was running around throwing books. Thereafter, A.M. followed the school guidance counselor, Ms. Modestin-Hillmon to her office.

67. The crisis intervention team arrived once A.M. was calmly working on mazes. The crisis team member asked A.M. to put the maze away to work on a "stop and think" activity.

68. At no time, was A.M. or could A.M. inflict serious bodily harm on himself or others.

69. Despite the fact that the student was compliant, calm and responding to requests appropriately, the crisis team called Jacksonville Sheriff's Office, and A.M. was committed under the Baker Act from 1:00 p.m. Tuesday until 4 p.m. Friday.

70. The school never contacted the parents and A.M.'s mother, K.M., was only called after A.M. was already at the facility. When she tried to get him discharged, River Point refused until the 24 hours has elapsed, and continued to refuse to release A.M. thereafter. Under the Baker Act, a child can be held up to 72 hours without contact with their parents.

71. On the day of A.M.'s commitment, he was sent to the emergency room for an injury sustained from another child, when the other child threw a book at him and hit him on the nose.

72. On September 7, 2016, after returning from the emergency room, A.M. was placed in a seclusion room for one hour at River Point because he was spitting water at the staff, and could not go to bed as he did not have his stuffed teddy bear or his nighttime medication which helps him sleep. He was six at the time of his commitment.

73. On September 7, at 9:30, A.M. could not sleep and was crying because he did not have his stuffed animal. The facility refused to provide the stuff animal citing infection control and safety.

74. On 9/8/16, A.M. was found with bruises on his leg

75. On September 8th, A.M. was bit by another child at River Point.

76. On September 8th, A.M. was allowed to have his stuffed animal.

77. After he was released from Baker Act commitment, on September 12, 2016, an IEP was finally created by the district. A.M. was found eligible for Exceptional Student Education (ESE) as a student with an Emotional Behavioral Disorder (EBD).

78. A.M.'s mother brought copies of private medical evaluations and was told that the school could not take them and that instead the parents have to have a "form filled out by his doctor."

79. The parents at their own expense, had the form filled out and A.M. was diagnosed with ADHD (difficulty with attention, focusing, hyperactivity, impulsivity) and DMDD (difficulty regulating moods and irritability).

80. A.M.'s IEP indicated that in the present level A.M. struggles with emotional self-control and anger control. He exhibits poor coping skills to environmental stressors and is additionally impeded by poor socialization.

81. A.M.'s IEP also indicated the following needs based on disability: to increase appropriate behaviors (responding with a calm voice, keeping hands and feet to himself, requesting a break) and improve basic social skills.

82. A.M.'s IEP indicated the following services: guided practice (support facilitation 3 times a week), instruction in social skills (resource pull out 3 times a week), and gifted services (resource pull out once a week).

83. The first time the parents saw a functional behavior assessment (FBA) was on September 28, 2016, nearly a full year after referral was signed by the Petitioner's father. The student had 28 disciplinary referrals resulting in eleven (11) days of out of school suspension.

84. On October 4, 2016, following the implementation of the BIP, the school threatened to
Baker Act A.M. again.

85. On October 17, 2016, an interim IEP meeting was held. At the time of this meeting,
K.M. was requesting "a behaviorist or ABA therapy." At this point, A.M. was "refusing
to go to school." A.M.'s tantrums were escalating to a new level, and he was not
completing any schoolwork. At this meeting, a self-contained placement at another
school was recommended. A.M.'s mother rejected this placement because no
additional supports had been attempted in in the current setting, and she felt as if the
recommended placement was too restrictive.

86. When A.M.'s mother rejected the interim IEP, she was told that that his current
supports would end at SPES, so she removed him from school briefly. Her worst fear
being that he would be "Baker Acted" again. She was afraid for his safety at school.

87. Removing A.M. to a more restrictive setting before attempting all interventions and
supports is a violation of LRE and a denial of FAPE.

88. During A.M.'s thirty-five (35) days present at SPES in first grade, he had eleven
disciplinary referrals resulting in 7 days of out of school suspension, 2 physical
restraints—one involving the principal not trained to restrain, the second by the School
Resource Officer (SRO) who handcuffed the Petitioner – not a proper restraint
procedure; twelve (12) class evacuations and one Baker Act commitment.

89. During A.M.'s time out of school, A.M. was seeing a mental health therapist and
receiving medication management from a psychiatrist. The experiences of being

handcuffed and then Baker Acted from school has resulted in the child not wanting to return to school. The experiences have caused PTSD.

90. Had the district provided the correct supports and services for A.M. in kindergarten, the student would never have had to be Baker Acted. The delay in providing the correct training and supports to the classroom teachers and the correct support and services for A.M. resulted in an increase in problem behaviors. The child who began by coloring on other student's papers now had behaviors that required restraint, handcuffing and removal from the school setting through a Baker Act.

91. The delay in evaluating this student increased the problem behaviors. The constant removal of the student from the classroom and school reinforced the unwanted behavior because it allowed the student to escape and avoid classwork that was hard or social situations that were stressful. Rather than address the needs of this student, the school disciplined the student. Instead of providing supports and services for this student, the school delayed identification and evaluation. The district used RTI to delay evaluation. The result was the student being out of the classroom and out of the school. Every time the student was out of the classroom, he was not receiving direct instruction. Every time he was out of the classroom he was not accessing his education. The substantive and procedural violations resulted in a clear denial of FAPE.

92. On October 18, 2017, a Final Order was issued, a copy of which is attached hereto as Exhibit "A".

93. The Final Order determined that the District failed to timely locate and evaluate a potentially disabled child, A.M., resulting in a denial of FAPE.

94. The Final Order further determined that A.M. is the prevailing party and entitled to reasonable attorneys' fees consistent with Florida Administrative Code Rule 6A-6.0331(x).

95. However, the Final Order denied A.M.'s request for compensatory education.

96. The Final order determined that the other claims of A.M. failed, either as a matter of fact or law, as follows:

    a.  Whether denial of 504 plan was due to deliberate indifference.

    b.  Whether A.M.'s placement in a self-contained behavioral unit setting at Holiday Hill Elementary School was an appropriate program and setting.

    c.  Whether any failure to comply with any applicable FBA, BIP or IEP occurred, and if so whether any such failure was either caused by the actions of A.M. or his parents and constituted the failure of the District to provide FAPE.

    d. Whether placement of A.M. occurring at Holiday Hill was necessary or appropriate to ensure the safety of Petitioner, other students and school personnel.

    e.  Whether placement of Petitioner in a general education program is necessary or appropriate for Petitioner to receive FAPE.

    f. Whether the supports and services were appropriate and if not, whether this caused a denial of FAPE.

    g.  Whether any restraints were reasonable and/or necessary under the circumstances and if not whether this caused a denial of FAPE.

h. Whether the Baker Act Commitment, occurring while Petitioner was at SPES caused a denial of FAPE.

i. Whether stay put was violated and if so caused a denial of FAPE.

j. Whether refusal to provide accommodations recommended by Petitioner's parents but not accepted by the IEP/MRT teams constitutes a denial of FAPE.

94. K.N. and A.M. are aggrieved parties from the Final Order.

95. K.N. and A.M. have performed all conditions precedent prior to the filing of the instant action.

96. K.N. engaged the Disability Independence Group, Inc., and the law firm of Langer Law, P.A. to represent them and are obligated to pay a reasonable fee for their services.


**COUNT 1**
**ATTORNEY'S FEES**

97. K.N. and A.M. repeat and reallege the allegations in paragraphs 1 through 96 of the Complaint as if fully set forth herein.

98. K.N. and A.M are entitled to attorney's fees as prevailing party pursuant to:

a.    20 U.S.C. § 1415(i)(2)(B) and (i)(3)(B)(i)(I);

b.    34 C.F.R. § 300.513;

c.    § 1003.57, Fla. Stat.; and

d.    Fla. Admin. Code R. 6A-6.03311(9).

99. Plaintiffs seek compensation for counsels' services performed and costs in the administrative hearing.

WHEREFORE, K.N. individually and on behalf of A.M. demands judgment against the Board for attorney's fees, costs, and interest incurred in pursuing their legal rights.

## COUNT 2
## VIOLATION OF FAPE – IDEA - BOARD

100.    K.N. and A.M. repeat and reallege the allegations in paragraphs 1 through 96 of the Complaint as if fully set forth herein.

101.    A.M.. is entitled to a free and appropriate public education ("FAPE")  pursuant to:

     a.    20 U.S.C.§ 1400 *et seq.;*

     b.    §1003.57(5), Fla. Stat.; and

     c.    Fla. Admin. Code R. 6A-6 *et seq.*

102.    As a result of the denial of FAPE, A.M. has sustained loss of educational benefit and K.N. has incurred expenses to provide educational and related services to A.M.

WHEREFORE K.N., individually and on behalf of A.M. requests enforcement of the Final Order that determined that there was a violation of the IDEA and demand judgment against the Board and requests this court to enter an Order for the Board  to:

(1) reimburse the expenses incurred by T.B. and K.B. for educational and related services;

(2) develop an appropriate IEP for A.M.. in the least restrictive environment or in the alternative payment of private school;

(3) develop an appropriate BIP that does not contain the use of restraint, or require institutionalization in a psychiatric institution;

(4) pay for additional evaluations and assessments in the form of independent educational evaluations;

(5) provide any necessary tutoring or other compensatory education;

(6) pay the reasonable costs and attorney's fees incurred by K.N.; together with such further relief as the court deems just and equitable.

## COUNT 3
## CIVIL RIGHTS – PROCEDURAL DUE PROCESS

103.    K.N. and A.M. repeat and reallege the allegations in paragraphs 1 through 96 of the Complaint as if fully set forth herein.

104.    Pursuant to IDEA and the Florida law implementing IDEA, the district had a duty and failed to provide K.N.. with procedural safeguards, including:

a.      Failure to timely identify and evaluate A.M.;

b.      failure to develop an IEP for A.M.

c.      failure to develop an BIP for A.M.;

d.      failure to implement an appropriate IEP;

e.      failure to implement an appropriate BIP;

f.      predetermined placement in a self-contained behavioral unity setting at

Holiday Hill Elementary School;

g.      failure to hold an eligibility meeting;

h.      improper use of restraint;

i.      improper use of arrest;

j.      improper use of Baker Act;

k.      improper isolation;

l.      improper seclusion;

m.      failure to allow the parent's meaningful participation;

105.      These violations were not de minimus and impacted the parents' ability to participate as equal members in the process, delayed and denied the student access to the supports needed to access his education in the least restrictive environment.

106.      The District's failures deprived K.N. of the right to procedural due process under the United States and Florida Constitutions.

107.      By violating K.N and A.M.'s constitutional rights, the District deprived K.N and A.M..'s. of their civil rights pursuant to 42 U.S.C. § 1983.

108.      As a result of the deprivation of their civil rights, K.N and A.M..'s. have been damaged.

WHEREFORE, K.N., individually and on behalf of A.M.., demands judgment against the Board for damages, together with their attorney's fees and costs pursuant to 42 U.S.C §1988, and such further relief as the court deems just and equitable.

K.N, individually and on behalf of A.M v. DUVAL COUNTY SCHOOL BOARD,
COMPLAINT
Page 26 of 34

## COUNT 4
## DE NOVO REVIEW

109.   K.N and A.M. repeat and reallege the allegations in paragraphs 1 through 96 of the

Complaint as if fully set forth herein.

110.   K.N and A.M.'s are entitled to de novo review of those parts of the Final Order for

which they are aggrieved parties.

WHEREFORE, K.N., individually and on behalf of A.M. requests a *de novo* review of the

Final Order and demand judgment against the District and requests this court to enter an Order

for the District to:

a.   reverse the decision of the ALJ and determine that placement in a self-
     contained behavioral unit setting at Holiday Hill Elementary School is
     inappropriate;

b.   reverse the decision of the ALJ and determine that the overuse of
     discipline was a violation of Section 504 of the Rehabilitation Act
     which deprived A.M. of instructional time in the classroom setting;

c.   reverse the decision of the ALJ and determine that the use of arrest and
     Baker Act were retaliatory and discriminatory;

d.   Reverse the decision of the ALJ and determine that the use of discipline
     was inappropriate;

e.   Reverse the decision of the ALJ and determine that the placement
     decision was predetermined;

f.   reverse the decision of the ALJ and determine that the procedural

violations were a denial of FAPE;

g.   reimburse the expenses incurred by K.N. for educational and related services;

h.   award compensatory education to make up for the time lost from classroom instruction;

i.   develop an appropriate IEP for A.M. in the least restrictive environment;

j.   develop an appropriate BIP for A.M. that does not include the use of restraint or institutionalization;

and

k.   pay the reasonable costs and attorney's fees incurred by K.N. together with such further relief as the court deems just and equitable.


## COUNT 5

### 42 U.S.C. § 1983 CIVIL RIGHTS VIOLATION CLAIM
### MONELL CLAIMS

111.   K.N and A.M. repeat and reallege the allegations, realleges paragraphs 1 through 96 and incorporates said paragraphs as if fully set forth herein.

112.   The District has an official policy and practice of routinely restraining and directing the institutionalization of children with behavioral disabilities despite no legal justification to do so.

113.   The District has actual knowledge that this practice deprives the constitutional rights of these children under the Fourth and Fourteenth Amendment of the U.S.

Constitution, however, it continues to direct this policy and practice to decrease the amount of arrests taking place within the district.

114.　It completely defies common sense that a six-year-old boy without a deadly weapon can "inflict serious bodily harm on himself or others" that could not be improved by other, less restrictive treatment alternatives.

115.　Further, the District's failure to implement less restrictive treatment alternatives, which it is required to do, further decreases any constitutional legitimacy of the efforts to utilize involuntary commitment as an option of behavioral modality.

116.　As such, the policy and practice of the District to direct the involuntary commitment of young children when probable cause cannot be met is a violation of well-established decisions under the Fourth Amendment and Fourteenth Amendment. <u>Youngberg v. Romeo</u>, 457 U.S. 307 (1982); <u>Humphrey v. Cady</u>, 405 U.S. 504, 509 (1972), ; <u>Vitek v. Jones</u>, 445 U.S. 480 (1980) and <u>Addington v. Texas</u>, 441 U.S. 418, 425 (1979).

117.　Any reasonable School District cognizant of its duties and obligations to the students with disabilities that it serves would be aware of the need for training on the prevention of use of institutionalization as a behavioral modification modality.

118.　The failures of the District to have a policy that encourages the use of institutionalization to address behavioral problems, and not to adequately to adopt policies or train its employees demonstrate that the District was deliberately indifferent to the constitutional rights of persons with behavioral disabilities, including A.M..

119. In failing to adopt policies adequately train its employees, the District violated the Fourth and Fourteenth Amendments to the United States Constitution as implemented by 42 U.S.C. § 1983.

WHEREFORE, K.N., individually and on behalf of A.M., demands judgment against the DUVAL COUNTY SCHOOL BOARD, an award of injunctive relief to require the Defendant to change its policies, and train its personnel, compensatory damages, reasonable attorney's fees and costs as provided by 42 U.S.C. § 1988, prejudgment interest and any further relief this Court deems equitable and just.

## COUNT 6

## VIOLATION OF TITLE II OF THE AMERICAN DISABILITIES ACT

120. K.N and A.M. repeat and reallege the allegations in paragraphs 1 through 96 of the Complaint as if fully set forth herein.

121. Plaintiffs further allege that the District failed to create and ensure implementation of A.M.'s IEPs and behavior plans in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–12165.

122. The District is a public entity and recipient of federal financial assistance, and is therefore subject to Title II.

123. The ADA provides a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities. 42 U.S.C. § 12101(b)(1)&(2).

124. The ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by
any such entity." 42 U.S.C. § 12132.

125.    Excluding children from the public-school classroom because of a disability or not
placing a student in the least restrictive environment is exactly the type of
discrimination and segregation the ADA and its amendments aim to prevent and
specifically prohibit.

126.    Further, the regulations implementing the ADA require that "a public entity shall
administer services, programs and activities in the most integrated setting appropriate
to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

127.    As public entities and instrumentalities of the state, the District is prohibited from
providing "a qualified individual with a disability with an aide, benefit or service that
is not as effective in affording equal opportunity to obtain the same result, to gain the
same benefit, or to reach the same level of achievement as that provided others." 28
CFR 35.130(b)(1)(iii)

128.    The District has discriminated against A.M. in violation of the ADA on the basis
of his disabilities by failing to timely identify and evaluate A.M. and by denying him
appropriate behavioral services in a school-based setting, resulting in his being
unnecessarily institutionalized and at risk of unnecessary institutionalization in
psychiatric facilities in the future.

129.    As a result of the District's policies, A.M. continues to be under risk of continual
institutionalization, and continued segregation in a segregated and isolated classroom
in order to access his education.  .

130.   Further, the exclusion of A.M. from the Defendant's summer program because of his disability is unlawful.

131.   Because of the Districts ongoing violations, A.M. and his parents continue to be harmed.

132.   The actions of the District were done with deliberate indifference to the rights of A.M., and his parents, and as such, the Plaintiffs are entitled to damages for their injuries as a result of these discriminatory policies.

WHEREFORE, K.N., individually and on behalf of A.M.,, respectfully request sthis Court to declare the actions of the Defendants violate the Americans with Disabilities Act, issue a permanent injunction enjoining the Defendants from discriminating against students with disabilities and awarding Plaintiffs' attorneys' fees, costs and expenses incurred in this matter and for such further relief as the court deems just and equitable.


## COUNT 7
## SECTION 504 OF THE REHABILITATION ACT OF 1973
## 29 U.S.C. § 794(a)

133.   K.N and A.M. repeat and reallege the allegations in paragraphs 1 through 96 of the Complaint as if fully set forth herein.

134.   Plaintiffs further allege that A.M. has a disability that substantially limits one or more major life activities and is a person with a disability under Section 504 of the Rehabilitation Act, as amended. See 29 U.S.C. §706(8).

135.   A.M. is otherwise qualified under section 504 of the Rehabilitation Act because he met the essential eligibility requirements of the District at all times material hereto.

136.    Defendant is a recipient of federal financial assistance.

137.    The District's policies, practices and procedures violated the Plaintiffs' rights under Section 504 of the Rehabilitation Act by discriminating against the Plaintiff because of his disability.

138.    Section 104.33 requires that Defendants to provide FAPE to "each qualified handicapped person who is in the recipient's jurisdiction." For purposes of Section 504, an "appropriate education" is the:

> provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of handicapped persons as adequately as the needs of non-handicapped persons are met and (ii) are based upon adherence to procedures that satisfy the requirements of §§ 104.34, 104.35, and 104.36.

139.    An "appropriate education" can also be provided by implementing an IEP that is compliant with IDEA. 34 C.F.R. §104.33(b)(2).

140.    Because the District did not timely identify and evaluate A.M. they violated section 504.

141.    In addition, because the District did not have an appropriate IEP and BIP and because the District failed to implement the BIP with fidelity, the Defendant has violated section 504.

142.    Repeatedly disciplining, removing and suspending A.M. for identified and known problem behaviors, resulted in an escalation of those behaviors, increased and harsher discipline, increased and lengthier removals from the classroom, his peers and educational environment, which lead to trauma, a dislike for learning, and a decrease in self-esteem and self-image.

143.   The Defendant has discriminated against A.M. in violation of Section 504 of the Rehabilitation Act on the basis of his disabilities by unnecessarily institutionalizing A.M., and placing him or at risk of unnecessary institutionalization.

144.   The Defendant has discriminated against A.M. in violation of Section 504 of the Rehabilitation Act by unnecessarily segregating A.M. into a segregated and isolated classroom in order to receive the care he requires;

145.   Further, the exclusion of A.M. from the Defendant's summer program because of his disability is unlawful and is in violation of Plaintiff's rights under Section 504.

146.   As a result of the Districts ongoing violations, A.M. and his parents continue to be harmed.

147.   The actions of the District were done with deliberate indifference to the rights of A.M., and his parents, and as such, the Plaintiffs are entitled to damages for their injuries as a result of these discriminatory policies.

WHEREFORE, Plaintiffs respectfully pray that this Court grant the following relief against the District, including entering a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that the Defendants' practices, policies and procedures have subjected Plaintiff to discrimination in violation of Section 504 of the Rehabilitation Act permanently enjoining Defendants from any practice, policy and/or procedure which will deny Plaintiffs equal access to and benefit from Defendants' services, award compensatory damages, reasonable costs and attorneys' fees and any other relief this court deems necessary and appropriate.

K.N, individually and on behalf of A.M v. DUVAL COUNTY SCHOOL BOARD,
COMPLAINT
Page 34 of 34

## JURY DEMAND

A TRIAL BY JURY IS DEMANDED FOR ALL ISSUES TRIABLE AS OF RIGHT BY A

JURY.

Dated this 16th day of January, 2018

By:

Matthew W. Dietz, Esq.
Florida Bar No. 0084905
TRIAL COUNSEL
**DISABILITY INDEPENDENCE GROUP, INC.**
2990 Southwest 35th Avenue
Miami, Florida 33133
T: (305) 669-2822 / F: (305) 442-4181
E-Mail: mdietz@justdigit.org
         aa@justdigit.org
         lgoodman@justdigit.org


LANGER LAW, P.A.
15715 S. Dixie Highway
Suite 405
Miami, Florida 33157
Telephone: (305) 901-6277
Facsimile (305) 901-6275

/s Stephanie Langer

Stephanie Langer, Esq.
Fla. Bar # 149720
Email: slanger@langerlawpa.com
*Attorneys for Plaintiffs*