**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

K.N., individually and on behalf
of A.M. a minor,

      Plaintiffs,

v.                              Case No.: 3:18-cv-00102-HES-JBT

DUVAL COUNTYSCHOOL BOARD,

      Defendant.
_____/

**PLAINTIFFS' MOTION FOR JUDGMENT**
**ON THE ADMINISTRATIVE RECORD AND**
**<u>REQUEST FOR ORAL ARGUMENT</u>**

Pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §

1415(i)(2) and this Court's Order of June 4, 2019 (ECF 26), Plaintiffs move the Court

to affirm the Administrative Law Judge's (ALJ) order in part, reverse in part, and permit

additional evidence on the scope of compensatory education to be awarded. Pursuant

to M.D. Fla. Local R. 3.01(j), Plaintiffs request oral argument. As grounds therefor,

Plaintiffs state:

1.      This is an action under the IDEA seeking compensatory education and

reimbursement for private behavioral services for Defendant's violation of its "Child

Find" duties and failure to provide a Free Appropriate Public Education (FAPE) to A.M.

2.      Child find requires school districts to identify, locate and evaluate all

children with disabilities who need special education and related services. 20 U.S.C.

1

§ 1412(a)(3)(A). School districts must provide FAPE to all children with disabilities who are determined eligible for services. *Id.* § 1412(a)(1)(A).

3.      A.M. began attending Defendant's school district in August 2015 as a Kindergarten student.

4.      On August 25, 2015, K.N. (A.M.'s mother) met with the school guidance counselor to inform her of A.M.'s diagnoses and behavioral problems. She requested an evaluation for special education services under the IDEA.

5.      It was not until over a year later in September 2016 that the Defendant identified A.M. as a child in need of special education services, developed an Individualized Education Program (IEP),[1] conducted a Functional Behavioral Assessment (FBA),[2] and developed a Behavioral Implementation Plan (BIP).[3]

6.      Having no special education services, including no adequate behavioral services, for over a year resulted in A.M.'s maladaptive behaviors escalating and a denial of FAPE.

7.      An administrative hearing was conducted in July and August 2017, and a Final Order issued on October 18, 2017. (ECF 28-1.) The ALJ ordered: (1)

---

[1] **Error! Main Document Only.**An IEP is a written statement for a child with a disability that is developed, reviewed, and revised in a meeting with the child's parent, teachers, and others. 20 U.S.C. § 1401(14); *id.* § 1414(d)(1)(A).

[2] **Error! Main Document Only.**A FBA is a systematic process for defining a student's specific behavior and determining the reason why (function or purpose) the behavior is occurring. The purpose of a FBA is to determine whether a behavioral intervention plan should be developed. Fla. Admin. Code R. 6A-6.03411(1)(q).

[3] **Error! Main Document Only.**A BIP uses positive behavioral interventions, supports and other strategies to address challenging behaviors, and enables the student to learn socially appropriate and responsible behavior. *Id.* 6A-6.03411(1)(d).

Defendant failed to timely locate and evaluate a potentially disabled child, Plaintiff, resulting in a denial of FAPE; (2) Plaintiff was a prevailing party and entitled to reasonable attorneys' fees; (3) Plaintiff's request for compensatory education was denied, as the evidence presented fails to sufficiently set forth a nexus between Defendant's child find violation and Plaintiff's behavioral and educational impediments; (4) The balance of Plaintiff's claims failed as a matter of fact or law, and are therefore dismissed; and (5) Defendant's proposed placement of a separate class placement approved. (*Id.* at 39.)

8.      Plaintiffs seek affirmance of the ALJ's order that child find was violated which resulted in a denial of FAPE, and that Plaintiffs are prevailing parties entitled to attorneys' fees.

9.      Plaintiffs seek reversal of the denial of compensatory education for Defendant's child find violations and for two issues that were dismissed: the failure to implement an appropriate BIP and the failure to maintain A.M in the least restrictive environment (LRE).

10.      Plaintiff K.N. also seeks reimbursement for costs she spent on private behavioral services. While she requested these in the administrative proceeding (*see* R. 369),[4] the ALJ did not rule on this relief.

**WHEREFORE,** Plaintiffs request oral argument, and that this Court: (1) affirm the ALJ's conclusion that the delay in identification of the child was a violation of the

---

[4] Citations are to the transcripts (Tr.) and record (R.) on appeal, although they have not yet been filed pending a consent motion to file it under seal. (ECF 30.)

IDEA and a denial of a FAPE; (2) affirm that Plaintiffs are prevailing parties and entitled to attorneys' fees for work performed at the due process hearing; (3) reverse the ALJ's order that A.M. is not entitled to compensatory education; (4) reverse the ALJ's conclusion that Defendant implemented an appropriate BIP; (5) reverse the ALJ's conclusion that A.M. cannot be educated in a regular classroom; (6) permit additional evidence on the scope of compensatory education to be awarded; (7) award reimbursement of private behavioral services to K.N., and (8) determine that Plaintiffs are entitled to attorneys' fees for this action.

<u>**MEMORANDUM IN SUPPORT**</u>

I.      **Standard of Review**

The IDEA envisions that courts make an independent ruling based on a preponderance of the evidence, with the majority of evidence coming from the administrative records. 20 U.S.C. § 1415(i)(2)(C); *Manecke v. Sch. Bd.*, 762 F.2d 912, 919 (11th Cir.1985). District courts review the administrative evidence and may grant relief without a trial by issuing a judgment on the record, even when facts are in dispute. *Loren F. v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1313 (11th Cir.2003). When weighing the evidence, a court gives "due weight" to the ALJ decision, and "must be careful not to substitute its judgment for that of the state educational authorities." *Walker Cnty. Sch. Dist. v. Bennett*, 203 F.3d 1293, 1297 (11th Cir.2000). However, ALJs are not entitled to blind deference. Courts are free to accept the ALJ's conclusions that are supported by the record and reject those that are not. *Loren F.*,

349 F.3d at 1314. When the ALJ's conclusions are rejected, courts are obliged to explain why. *R.L. v. Miami-Dade Cnty. Sch. Bd.*, 757 F.3d 1173, 1178 (11th Cir. 2014).

## II.    Statement of Facts

Prior to A.M.'s first day of school for the 2015-16 school year, he was admitted by K.N. to the Mental Health Resource Center. He was diagnosed with Disruptive Mood Dysregulation Disorder, and put on new medications. (ECF 28-1 ¶ 2.)

On August 25, 2015, K.N. informed the school of A.M.'s diagnoses and mental health treatment, and requested an IEP. (*Id.* ¶ 4.) On August 31, 2015, A.M.'s regular education teacher emailed the guidance counselor identifying A.M.'s diagnoses and behavioral issues. (*Id.* ¶ 5; R. 1790.) The guidance counselor provided "Simon Says" videos to A.M. regarding "keeping his hands to himself." (ECF 28-1 ¶ 6.) For the first few weeks of school, the teacher logged many behavioral episodes and lack of appropriate social interaction, including hitting, fighting, scribbling on other students' papers, rough play, touching others, talking out during lessons, and pushing in line. (*Id.* ¶ 7; R. 1801-03.)

On September 14, 2015, a team meeting was held, during which time the team was made aware of the behavioral episodes. (ECF 28-1 ¶ 7.) Despite the numerous behavioral issues impeding A.M.'s ability to succeed in school, the threat he posed to other students, and the specific request for evaluation for an IEP by K.N., the team refused to evaluate him and issued a written Notice of Refusal. (*Id.* ¶ 8; R. 718.) The teacher noted continued behavioral problems for the last few weeks of September. (R. 1803-04.)

On October 1, 2015, a behavior intervention documentation sheet was created to attempt to replace A.M.'s negative behaviors with positive ones. (ECF 28-1 ¶ 10; R. 1747-48.) The intervention was to remove A.M. from group settings to a designated cool down area, and provide verbal reminders of behavioral expectations, preferential seating, and proximity control. (ECF 28-1 ¶ 10.) This sheet was only utilized during the morning group lesson for one hour. (*Id.* ¶ 10; R. 1747.) It was not based on data or a FBA, and was not a BIP. (Tr. 509:11-510:6.)

These interventions failed. The teacher's log shows that between October 1 and December 4, physical aggressive acts against other children and classroom disruption continued. (ECF 28-1 ¶ 11; R. 1804-06.) The ALJ found that it was undisputed that the interventions "produced very limited success" and were "ineffective in changing [A.M.'s] behavior." (ECF 28-1 ¶ 12.)

After months of unsuccessful interventions, A.M.'s father requested an evaluation on December 7, 2015. (*Id.* ¶ 13.) Yet again, the team met and acknowledged A.M.'s disability, reviewed the considerable number of behavioral issues, agreed to start a FBA, but again refused to evaluate A.M. for special education services. (*Id.* ¶ 13; R. 756.) The behavioral incidents continued. (R. 1806-08.)

On February 11, 2016, A.M.'s teacher implemented a different behavior sheet to monitor three target behaviors: "keep hands and feet to self," "disruptive," and "hurting others." (ECF 28-1 ¶ 14; R. 1331-33.) A.M. received disciplinary referrals in February and March 2016 for numerous physical aggressions against other students. (ECF 28-1 ¶ 15; R. 1808-11.)

On April 1, 2016, the school psychologist put the teacher's observations on a form called a Functional Behavioral Assessment (R. 762; Tr. 509-11:510:6), although a true FBA was not conducted, nor was a BIP developed. (ECF 28-1 ¶ 14.) Before children are designated as a child with a disability, formal FBAs are not conducted in Duval. Instead, they merely receive a general Response to Intervention process.[5] (Tr. 466:33-467:7; 484:15-25.)

On April 4, 2016, following months of A.M. receiving numerous referrals for aggressive behaviors toward other students, his teacher requested an evaluation. (ECF 28-1 ¶¶ 15-16; R. 1337.) The team agreed to evaluate,[6] and A.M.'s parents signed a consent form. (ECF 28-1 ¶¶ 16-17; R. 1339.) An evaluation report was completed in June 2016. (ECF 28-1 ¶ 20; R. 985-1002.)

From April through June 6, 2016, A.M. received additional referrals for aggressive behaviors, demonstrating that the interventions continued to be unsuccessful, and that special education services were needed. (ECF 28-1 ¶¶ 22-23; R. 1812-22.) In May 2016, A.M.'s teacher emailed the Principal that A.M.'s behavior put other children at risk of injury and requested "a special needs provision" be made immediately. (ECF 28-1 ¶ 23; R. 1773.) A.M.'s teacher could not identify his triggers, meaning she did not know what was causing him to misbehave. (ECF 28-1 ¶ 24; Tr.

---

[5] School districts must develop and implement Response to Intervention/Multi-Tiered System of Support procedures which integrate a continuum of academic and behavioral interventions for students who need additional support to succeed in the general education environment. Fla. Admin. Code R. 6A-6.0331(1).

[6] The form was initially mistakenly checked for not approving an evaluation, but the form was later corrected to recommending the evaluation. (R. 753.)

66:15-25; 78:17-79:6.) On June 6, 2016, she emailed the Principal and refused to allow A.M. in her class for the rest of the semester out of the safety and protection of the students and herself. (ECF 28-1 ¶ 24; R. 1760.) Defendant denied her request, which resulted in A.M.'s parents keeping him home for the final week of school. (ECF 28-1 ¶ 25.)

Failing to conduct a FBA and develop an appropriate BIP during A.M.'s entire Kindergarten year resulted in escalating behaviors, twenty-two disciplinary referrals (R. 935-56), a considerable amount of time out of the classroom, and a report card indicating unsatisfactory progress in social growth and development. (ECF 28-1 ¶ 26.) A.M. was not provided FAPE during his 2015-16 school year.

Defendant continued the failing strategy into the 2016-17 school year. (*Id.* ¶¶ 27-29.) A.M.'s aggressive behaviors continued. (*Id.* ¶ 29.) On August 24, 2016, and on several other occasions, school staff and a school resource officer who were not trained in restraint for children with disabilities responded to A.M.'s behavior by picking him up and holding him around the torso. (Tr. 110:11-113:11; 116:25-117:14; 209:19-210:13). These restraints were conducted in a manner contrary to best practices. (Tr. 188:2-14; 209:19-210:13; 228:5-229:2; 230:3-23.) A.M. demonstrated an aversion to touch thus restraining him could lead to escalation of his behaviors. (Tr. 176:22-177:2; 226:15-227:3.) Moreover, Defendant argued that because A.M. had not yet been found eligible for special education services, no staff training on proper restraint use was necessary. (Tr. 115:4-20; 116:3-14; 117:7-23; 120:12-121:9; 147:6-148:15.)

Defendant's failure to provide appropriate behavioral services resulted in A.M.'s escalating behaviors to the point that the school decided to Baker Act[7] him on September 6, 2016, where he remained institutionalized for several days. (ECF 28-1 ¶ 30.)

On September 12, 2016, A.M. was found eligible for special education services under the category of Emotional/Behavioral Disability, and an IEP developed. (*Id.* ¶ 31; R. 693-705.) He was placed in a regular education setting for the majority of the day with social skills instruction three times per week, differentiated curriculum once per week occurring in a resource room, and one day of gifted instruction. (ECF 28-1 ¶ 32.)

On September 29, 2016, the school conducted a FBA and created A.M.'s first BIP. (R. 764-69.) The functions of A.M.'s behavior was considered "attention, control and escape." (R. 766; ECF 28-1 ¶ 34.) Defendant's prior interventions thus served to reinforce A.M.'s behaviors by rewarding him with attention and avoidance when he misbehaved. (Tr. 172:1-14; 177:3-8; 179:8-21; 202:1-17; 207:9-208:21; 210:21-211:4; 218:3-220:6; 605:1-23.) Further, the BIP was not adequate as it did not address both attention and escape and their interactions together. (Tr. 179.)

On October 17, 2016, only a few school days after a BIP was started, the IEP was amended to remove A.M. from the regular education classroom and place him in a separate behavioral unit. (R. 678-83, 692, 2756-60.) Defendant refused to continue

---

[7] The Baker Act provides for involuntary examination and commitment under Chapter 394, Fla. Stat. (2019).

providing services in a "general education classroom (inclusion)." (R. 959.) A.M.'s parents objected to this placement and requested he be provided with a a one-on-one aide and additional behavioral supports in the classroom. (ECF 28-1 ¶ 37.)

A.M.'s parents took him out of school after October 19, 2016. (*Id.* ¶ 41.)

In order for A.M. to access education, he required intensive therapy in a clinical environment for a period of time after the removal with a slow increase of service amount in the educational setting until he could tolerate the demands. (Tr. 173:1-176:19; 179:22-180:8.) This service was provided through a private behavior specialist from November 2016 through March 2017 at a cost of $40,108.75. (R. 2144-79.)

### III.    ALJ Failed to Apply Current Legal Standard for Determining FAPE.

Plaintiffs filed an administrative due process complaint in October 2016. A final order was issued on October 18, 2017. After the complaint was filed, but before the hearing and final order, the Supreme Court established a new standard for determining FAPE violations. *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988 (2017). The ALJ erred in not applying the *Endrew F.* standard, incorrectly noting that the new standard did not apply. (ECF 28-1, at 41 n.13.) The ALJ concluded that FAPE was denied even under the old standard. Therefore, the ALJ's failure to award compensatory education requires reversal under either standard. However, the facts of this case should be analyzed under the new legal standard.

Evaluation of Plaintiffs' claims under the *Endrew F.* standard is required if it is a change in law from *Bd. of Educ. v. Rowley*, 458 U.S. 176 (1982). *S.M. v. Hendry Cnty. Sch. Bd.*, No. 2:14-CV-237, 2017 WL 4417070, at *2 (M.D. Fla. Oct. 5, 2017)

(court held *Rowley* is "outdated standard" and *Endrew F.* presents a "markedly different" standard); s*ee also Endrew F. v. Douglas Cnty. Sch. Dist. RE-1,* 290 F. Supp. 3d 1175, 1177-78 (D. Colo. 2018) (district court on remand found that the Supreme Court had articulated a new standard for determining FAPE).

Prior to 2017, the leading case on analyzing whether FAPE has been provided was *Rowley*, which held that a child's educational program must be reasonably calculated to enable the child to receive some educational benefit. 458 U.S. at 203-04. In March 2017, the Court examined the *Rowley* test. *Endrew F.*, 137 S. Ct. at 994-96, 997-00. It distinguished *Rowley* in that Endrew (1) "exhibited multiple behaviors that inhibited his ability to access learning in the classroom" and (2) "was failing to make meaningful progress toward his aims." *Id.* The Court articulated a higher standard. Instead of educational programs being reasonably calculated to make "some" progress, they must be "reasonably calculated to enable a child to make progress appropriate in light of child's circumstances." *Id.* at 1001. Noting that this standard is "markedly more demanding than the 'merely more than *de minimis*' test," applied by the Tenth Circuit, the Court rejected that test. *Id.* It reasoned that "instruction that aims so low" would hardly be offering an education at all. *Id.*

Under *Endrew F.*, an IEP must consider the child's circumstances and be "constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." *Id.* at 999. Further, IEPs must "aim to enable a child to make progress" because "the essential function of an IEP is to set out a plan for pursuing academic and functional advancement." *Id.* For most children,

this means an IEP that provides "integration in the regular classroom and individualized special education calculated to achieve advancement from grade to grade" in the general education curriculum. *Id.* at 1000. For children with behavioral needs, behavioral services are part of the educational program. *Enter. City Bd. of Educ. v. S.S.*, No. 1:19-CV-748, 2019 WL 7042511, at *2 (M.D. Ala. Dec. 20, 2019) (BIP, services from a Board Certified Behavior Analyst, 1:1 behavior aide, and counselor are part of the child's educational program).

### IV.    A.M.'s Circumstances and Lack of Progress

Similar to Endrew, A.M. has significant behaviors that inhibit his ability to access learning. A.M. is a gifted child with serious social, emotional and behavioral disabilities. As young as four, he was diagnosed with Attention Deficit Hyperactivity Disorder and Oppositional Defiant Disorder for which he received medications. (ECF 28-1 ¶ 1.) He showed aggressive behaviors toward his mother (*id.* ¶ 2) and multiple serious behavioral incidents occurred in school (*id.* ¶¶ 7, 11). He received disciplinary referrals for aggressions against other students and other maladaptive behaviors. (*Id.* ¶¶ 15, 22, 23.) In Kindergarten, his grades indicated excellent progress in language arts and math and unsatisfactory progress in social growth and development. (*Id.* ¶ 26.) A June 2016 psychoeducational report found that although A.M.'s cognitive ability was within the superior range (*id.* ¶ 21), testing showed that his "reading and math skills were lower than expected given his estimated cognitive ability." (R. 693, 993.)

A.M.'s "circumstances" are that he has superior cognitive ability and serious social, emotional and behavioral disabilities. His academic progress has been

impeded by his significant maladaptive behaviors. He regressed in his social, emotional and behavioral goals, and had lower than expected progress in academic skills. Thus, there was a denial of FAPE. *Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022, 1028-29 (8th Cir. 2003) (FAPE was denied where "no cohesive plan was in place to meet [the student's] behavioral needs" and thus "he was not able to obtain a benefit from his education"); *Indep. Sch. Dist. No. 284 v. A.C.*, 258 F.3d 769, 776–77 (8th Cir. 2001) ("mere fact that Congress regards emotional disturbances as disabilities entitling a child to special education shows ... social and emotional problems are not *ipso facto* separable from the learning process"); *B.H. v. West Clermont Bd. of Educ.*, 788 F. Supp. 2d 682, 699 (S.D. Ohio 2011) (need to look at both academic and functional progress).

V.    **ALJ Order**

A.  **ALJ correctly found Defendant failed in its child find obligation.**

The ALJ correctly concluded that Defendant failed in its child find duties. Both of A.M.'s parents on different occasions requested that he be evaluated for special education services. His teacher logged numerous serious behavioral incidents and also requested an evaluation. Defendant thus had reason to suspect that A.M. was a child with a disability, triggering its child find duty. *See Phyllene W. v. Huntsville City Bd. of Educ.*, 630 Fed. Appx. 917, 925 (11th Cir. 2015) (child's mother informing the school about the child's disability, coupled with the Board's knowledge that the mother was actively seeking treatment for the child's disability, supported a finding that the Board should have at least "suspected" a disability might be present); *Sch. Bd. of City*

*of Norfolk v. Brown*, 769 F. Supp. 2d 928, 942-43 (E.D. Va. 2010) (school deemed to have knowledge where parent expressed concern in writing, requested an evaluation <u>or</u> teacher expressed specific concerns about a pattern of behavior); *Draper v. Atlanta Indep. Sch. System*, 518 F.3d 1275, 1281 (11th Cir. 2008) (school failed to evaluate for dyslexia even though student wrote letters and numbers backwards).

Defendant's child find violation began in August 2015 when A.M.'s mother alerted the school of serious behavior problems and requested an evaluation, and ended on September 29, 2016, after he was found eligible, and the first IEP and BIP were developed.[8] (ECF 28-1 ¶¶ 31, 34.) Defendant's failure resulted in a denial of FAPE. *See L.C. v. Tuscaloosa Cnty. Bd. of Educ.*, No. 7:15-CV-750-RDP, 2016 WL 1573269, at *4 (N.D. Ala. 2016) (failure of child find constitutes denial of FAPE).

### B. ALJ erred in concluding that Defendant implemented a BIP.

The ALJ incorrectly found that the October 2015 behavior sheet and subsequent interventions were appropriate (ECF 28-1 ¶ 64), and that the behavior sheet constituted a BIP (*id.* ¶¶ 10, 64). A.M.'s lack of behavioral progress was based

---

[8] The ALJ is unclear about how long the child find violation lasted. He implies that Defendant's failure resulted in an approximate four-month delay from December 7, 2015, to April 1, 2016. (ECF 28-1 ¶ 54.) He concluded that Defendant's refusal to evaluate on September 14, 2015, was reasonable because A.M. was a new student and Defendant had not yet had sufficient time. (*Id.* ¶ 52.) This finding is erroneous as the need for special education services was obvious from A.M.'s very first day at school, or at the very least by the time of the September 2015 meeting. The ALJ also erroneously suggested that the child find violation ended on April 1, 2016. (*Id.* ¶ 54.) He assumed that Defendant "had properly completed its evaluations, and conducted an IEP meeting by April 1, 2016." (*Id.*) Yet the evaluation was not completed until June (*id.* ¶¶ 18, 20), and A.M. was not determined eligible and received an IEP until September 16, 2016, and a BIP developed on September 29, 2016. (*Id.* ¶¶ 31, 34.) This Court should not rely on the ALJ for the length of the violation.

on Defendant's failure to address "behavioral problems in a systematic and consistent way," which resulted in a denial of FAPE. *Pocono Mountain Sch. Dist. v. J.W.*, No. 3:16-CV-0381, 2017 WL 3971089, at *7 (M.D. Pa. Sept. 8, 2017) (citation omitted).

Before September 29, 2016, Defendant never conducted a FBA and consequently failed to identify the function of A.M.'s interfering behaviors. *See* Fla. Admin. Code R. 6A-6.03411(1)(q). FBAs pinpoint problematic behavior, clearly define the behavior, and identify its contributing factors. *Bd. of Educ. of Wappingers Central Sch. Dist. v. M.N.*, No. 16-CV-09448, 2017 WL 4641219, *11 (S.D.N.Y. Oct. 13, 2017). With this information, IEP teams are able to develop appropriate plans for how to target and eliminate negative behaviors, and how to build appropriate replacement behaviors. *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 190 (2d Cir. 2012) (purpose of FBA is to "ensure that the IEP's drafters have sufficient information about the student's behaviors to craft a plan that will appropriately address those behaviors"). A FBA requires collection of data. *See, e.g., A.E.B. v. Ga. Dep't of Educ.*, No. 1:07-575, 2009 WL 10701918, *3 (N.D. Ga. July 28, 2009) (need to collect data on behavior and attempted interventions to improve response to behaviors); *L.M. v. Henry Cnty. Bd. of Educ.*, No. 3:18-37, 2019 WL 4576267, *3 (E.D. Ky., Sept. 20, 2019) (failure to collect high quality data makes FBA useless).

The October 2015 behavior sheet only recorded the teacher's anecdotal descriptions of A.M.'s conduct in the classroom. (ECF 28-1 ¶ 10.) Anecdotal logs do not constitute data collection sufficient for a FBA. (Tr. 202:10-17.) The behavior sheet was not based upon data, nor were the interventions based on the results of a FBA.

(Tr. 509:11-510:6.) The functions of A.M.'s behavior was determined in September 2016 to be "attention, control and escape." (R. 766.) Thus, the October 2015 intervention of removing A.M. from group settings to a designated cool down area, and evacuating the class throughout 2015-16, or increasing the amount of attention paid to A.M. when he needed to be removed, only served to reinforce the bad behavior. (Tr. 172:1-14; 177:3-8; 179:8-21; 202:1-17; 207:9-208:21; 210:21-211:4; 218:3-220:6; 605:1-23.) Due to the lack of understanding of the causes and functions of A.M.'s maladaptive behaviors and the inadequacy of Defendant's response, A.M.'s behavior escalated to the point of Defendant initiating a Baker Act. (ECF 28-1 ¶ 30.)

It was not until December 7, 2015, that Defendant agreed to conduct a FBA. (*Id.* ¶¶ 8, 13.) Yet it did not do so. Contrary to the ALJ's finding, the April 1, 2016, document was not a FBA. (*See id.* ¶ 14.) Though the form used was called a FBA, the school psychologist and Defendant's counsel made clear it was not one. (Tr. 484:15-486:14; 486:17-487:6; 509:11-510:6.) Failure to conduct a FBA may not by itself be a violation of the IDEA if the IEP "adequately identifies a student's behavioral impediments and implements strategies to address that behavior." *Rosaria M. v. Madison City Bd. of Educ.* 325 F.R.D. 429, 439 (N.D. Ala. 2018). That did not occur here as there was no IEP or BIP at all until September 2016.

Regardless of what the April 2016 document was, it did not result in a BIP. (ECF 28-1 ¶ 14.) A BIP is a plan that, *inter alia*, uses positive behavioral interventions that address challenging behaviors and which enables a student to learn socially appropriate responsible behavior in educational settings. Fla. Admin. Code R. 6A-

6.03411(1)(d). The failure of an IEP to contain a BIP for a child with behavior challenges that interfere with learning is a violation of FAPE. *Escambia Cnty. Bd. of Educ. v. Benton*, 406 F. Supp. 2d 1248, 1265-68 (S.D. Ala. 2005) (affirming ALJ finding of denial of FAPE because of lack of behavior plan); *Neosho R-V Sch. Dist.*, 315 F.3d at 1029 (no cohesive plan in place to meet child's behavioral needs supports ultimate conclusion that he was not able to obtain a benefit from his education). Official commentary to the federal regulations expressly states that "a failure to ... consider and address [behaviors impeding learning] in developing and implementing the child's IEP would constitute a denial of [a] FAPE to the child." 34 C.F.R. Part 300, App. A, § IV, Ques. 38 (July 1, 1999, ed.) (attached as Ex. 1.)

Despite not being able to identify what triggered A.M.'s outbursts, Defendant did not initiate a formal FBA and BIP until September 29, 2016 — after over a year of ineffective attempts to curb his behaviors. (ECF 28-1 ¶¶ 24, 34.) The failure to adequately assess the function of A.M.'s behaviors and develop an appropriate plan to teach him socially appropriate behaviors was a denial of FAPE as A.M. failed to progress behaviorally which impeded his access to learning.

### C. ALJ erred in concluding that a separate class mainstreamed A.M. to the maximum extent appropriate.

The ALJ erred in his conclusion that Defendant "cannot satisfactorily educate [Plaintiff] in the regular classroom setting" and that a separate class mainstreamed him to the maximum extent appropriate. (*Id.* ¶¶ 71, 73.) The ALJ failed to consider whether a one-on-one aide or other behavior supports would enable A.M. to be educated in the regular classroom. As the ALJ specifically noted that the BIP had only

17

been implemented for a matter of days, his analysis focused on the severity of A.M.'s behaviors <u>before</u> the BIP was implemented and the disruption caused when the other students were evacuated. (*Id.*)

The IDEA requires that children with disabilities be educated in the LRE with their non-disabled peers to the "maximum extent appropriate," rather than being placed in separate special education classes. 20 U.S.C. § 1412(a)(5); Fla. Admin. Code R. 6A-6.03028(3)(i)(1). Removal from regular classes only occurs where "the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services[9] cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5); Fla. Admin. Code R. 6A-6.03028(3)(i)(2). Florida rules specify that removal from the regular classroom cannot be made "solely because of needed modifications in the general education curriculum." Fla. Admin. Code R. 6A-6.03028(3)(i)(4)(e).

The ALJ gave weight to the potential benefit that a separate class would provide. (ECF 28-1 ¶ 71.) A child's lack of progress in a regular education setting which is attributable to the lack of support services should not weigh in favor of placement in a separate or special education classroom. *Cobb Cnty. Sch. Dist. v. A.V.*, 961 F. Supp. 2d 1252, 1266 (N.D. Ga. 2013) (upholding ALJ finding that child succeeded academically when supports provided, and failed, in part, when they were

---

[9] Supplementary aids and services are those that are "provided in regular education classes or other education-related settings to enable children with disabilities to be educated with children without disabilities to the maximum extent appropriate." 34 C.F.R. § 300.42.

not). Here, the ALJ gave improper weight to the disruptive nature of A.M.'s disability without considering potential supplementary services, especially in light of the Defendant's repeated failure to provide needed behavioral supports that contributed to the escalations in behaviors. (Tr. 172:1-14; 177:3-8; 179:8-21; 202:1-17; 207:9-208:21; 210:21-211:4; 218:3-220:6; 605:1-23.) Defendant did not consider how supplementary services, if appropriately implemented, could enable A.M. to remain in regular classes. *See Greer v. Rome City Sch. Dist.*, 950 F.2d 688, 698 (11th. Cir. 1991), withdrawn, 956 F.2d 1025, reinstated in pertinent part, 967 F.2d 470 (11th Cir. 1992) (no deference to school's determination that student would receive more benefit from self-contained special education classroom because school failed to consider benefit she would receive from education in a regular classroom with appropriate supplemental aids and services).

Although A.M. might have benefitted from a smaller class size and behavioral support in the special education classroom (ECF 28-1 ¶ 71), these benefits stem from A.M.'s need for additional attention, and would be appropriate to provide in a regular classroom with qualified personnel. (Tr. 184:2-13; 736:9-737:11.) Without first using supplemental aids and services in the regular class, the benefits of a special class would fall short of the need to provide education in the least restrictive environment.

In examining least restrictive environment, the Eleventh Circuit first asks whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily. *Greer*, 950 F.2d at 696. Adequate consideration of placement during development of the IEP focuses on how the child

19

may be kept in regular education through the provision of supplementary services; it should be "ma[de] clear in what context these aids and services were considered." *Cobb Cnty.*, 961 F. Supp. 2d at 1266 (regular education class co-taught by special education teacher with supplemental aids and services was LRE).

Here, the context in which Defendant decided on placement in separate special education classes shows that it did so without adequately considering what supplementary services would allow A.M. to remain in regular education. A.M.'s September 12, 2016, IEP placed him in regular education for the majority of the day. (ECF 28-1 ¶ 32.) At the October 2016 meeting, Defendant elected to move A.M. to a separate behavioral unit. Despite the September 2016 IEP having been in place for only a few weeks, and the BIP even less time, Defendant refused to continue providing services in the regular classroom, pointing to the urgency of A.M.'s needs and the importance of reducing time spent away from class. (R. 959.) His parents requested the supplementary services of a student-focused one-on-one aide and additional behavioral supports. (ECF 28-1 ¶ 37.) Direct support from an aide within the regular education classroom is a regularly accepted supplementary service. *See, e.g., Enter. City*, 2019 WL 7042511, at *2.

Defendant cannot fall back on A.M's behavioral issues to justify moving him to a more restrictive placement when the IEP failed to adequately provide for supplementary services. *Greer*, 950 F.2d at 696. The October 2016 IEP failed to provide an appropriate education in the LRE.

### D.  ALJ erred in failing to award compensatory education.

The ALJ concluded that the child find violation resulted in a denial of FAPE. (ECF 28-1, at 39.) Yet he denied compensatory education based on his conclusion that "the evidence presented fails to sufficiently set forth a nexus between [Defendant's] child find violation and [Plaintiff's] behavioral and educational impediments." (*Id.*) This is error based on the law and facts of this case. In the Eleventh Circuit, it has long been held that once a determination has been made that a school board failed to provide FAPE, compensatory education that prospectively compensates for past deficient programs is awarded. *Draper*, 518 F.3d at 1280; *Todd D. v. Andrews*, 933 F.2d 1576, 1584 (11th Cir.1991); *Jefferson Cnty. Bd. of Educ. v. Breen*, 853 F.2d 853, 857 (11th Cir.1988). It does not appear that the ALJ used this standard. Further, the ALJ failed to analyze A.M.'s failure to progress that was due to Defendant not providing an appropriate education for over a year. *See J.N. v. Jefferson Cnty. Bd. of Educ.*, No. 2:19-cv-00047, 2019 WL 5788399, at *6 (N.D. Ala. Nov. 6, 2019), *appeal filed* Dec. 5, 2019 (error for ALJ to find child find violation, but deny compensatory education without addressing evidence of declining grades, behavioral issues, and poor test results).

A.M. did not make progress appropriate in light of his circumstances. *See Endrew*, 137 S. Ct. at 1001. Defendant's failure to identify him as a student with a disability resulted in a year of ineffective interventions where he made no progress on social, emotional and behavioral goals: his report card showed he failed in social emotional growth. Even though A.M. received some regular education interventions,

they were insufficient to provide FAPE. *See Jana K. v. Annville-Cleona Sch. Dist.*, 39 F. Supp. 3d 584, 604 (M.D. Pa. 2014) (effective supports were not provided as they were "informal, unsupervised, and patchwork," "uncoordinated and intermittent" and "lacked the accountability, measurable goals, and progress monitoring that an IEP would have provided").

The inadequate and untimely FBA and BIP resulted in a deterioration in behavior to the point of evacuating other children from his class, restraining him, and Baker Acting him from school. Lack of progress or regression of the student's behavior or academics is evidence of failure to provide FAPE. *Suggs v. D.C.*, 679 F. Supp. 2d 43, 51-52 (D.D.C. 2010) (educational benefit not provided if "child's social behavior or academic performance has deteriorated under his current educational program"). Even if a child shows some academic progress, failure to address behavioral needs is a denial of educational benefit. *Alex R. v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221*, 375 F.3d 603, 613 (7th Cir. 2004) ("IEP that fails to address disability-related actions of violence and disruption in the classroom is not 'reasonably calculated to enable the child to receive educational benefits'"); *B.H.,* 788 F. Supp. 2d at  699 (regression in behavioral goals constituted denial of FAPE).

Despite being a gifted student, A.M.'s academic progress was lower than expected in reading and math. He did not receive an IEP until after he was Baker Acted by the school. And he did not receive a FBA and BIP until after the IEP was developed. The child find violation clearly resulted in a denial of FAPE for which compensatory education is warranted. *Jana K.*, 39 F. Supp. 3d at 604 (compensatory

education awarded due to District's violation of child find and subsequent decline in child's emotional well-being and academic performance).

### E.  ALJ erred in not awarding reimbursement.

The ALJ did not address Plaintiff's request for reimbursement of the private behavioral services. (*See* R. 369.) As detailed above, Defendant provided insufficient and untimely behavioral services. Due to this insufficiency, K.N. took A.M. out of school and obtained private behavioral services. K.N. seeks reimbursement for $2,975 paid to Florida Children's Institute, and $37,133.75 for the amount due, for a total of $40,108.75. (R. 2144-79.)

The Supreme Court has held that the IDEA's provision of "grant such relief as the court determines is appropriate" in 20 U.S.C. § 1415(i)(2)(C)(iii) includes retroactive tuition reimbursement. *Sch. Comm. of Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369, 370-71 (1985) (reimbursement is not damages, but rather is requiring the school district to pay expenses it should have paid all along).

Behavioral services are appropriate for reimbursement under the IDEA. *See, e.g., Sumter Cnty. Sch. Dist. 17 v. Heffernan*, 642 F.3d 478, 489 (4th Cir. 2011) (reimbursement for intensive behavioral therapy in a home placement); *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 865-66 (6th Cir. 2004) (reimbursement for home-based behavioral therapy).

The IDEA provides for reimbursement for students "who previously received special education and related services" if the school district "had not made a free appropriate public education available to the child in a timely manner." 20 U.S.C. §

1412(a)(10)(C)(ii). In reviewing this provision, the Supreme Court held that because the school had violated child find requirements, reimbursement was proper even though child had not previously received special education through the public school. *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 245 (2009). Similar to *Forest Grove*, Defendant here violated child find requirements, thus reimbursement for private behavioral services should be permitted to be reimbursed upon a finding that Defendant failed to provide FAPE in a timely manner.

**VI.    Determining the Scope of Compensatory Education.**

In the event this Court determines that compensatory education should be awarded, Plaintiffs seek leave for the taking of additional evidence regarding A.M.'s current educational needs in order to provide the "educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." *Reid v. Dist. of Columbia*, 401 F.3d 516, 524, 526 (D.C. Cir. 2005) (parties must have some opportunity to present evidence regarding specific educational deficits resulting from loss of FAPE and specific compensatory measures needed to best correct them). The scope of compensatory education is a matter to be proved at an evidentiary hearing. *Gill v. Dist. of Columbia*, 751 F. Supp. 2d 104, 113-114 (D.D.C. 2010). The award must be based on the student's current educational abilities. *Friendship Edison Pub. Charter Sch. Collegiate Campus v Nesbitt*, 583 F. Supp. 2d 169, 172 (D.D.C. 2008). The district court has "broad discretion" in fashioning relief "regardless of the options offered in the discussion of the administrative law judge." *Draper*, 518 F.3d at 1285.

Compensatory education is not automatically awarded based upon a set formula. *Parents of Student W. v. Puyallup Sch. Dist. No. 3,* 31 F.3d 1489, 1497 (9th Cir. 1994) (compensatory education is part of court's resources in crafting appropriate relief). Rather, compensatory awards should place children in the position they would have been in but for the violation of the Act. *Reid*, 401 F.3d at 525 ("whereas ordinary IEPs need only provide "some benefit" [under old *Rowley* standard], compensatory education must do more - they must *compensate*). Thus, the award must be based on a qualitative approach that relies on individualized assessments. *Id.* at 524.

## VI.    Plaintiffs are Entitled to Attorneys' Fees

District Courts may award attorneys' fees to parents who prevail in administrative due process hearings. 20 U.S.C. § 1415(i)(3)(B)(i)(I). The IDEA's legislative history requires that "prevailing party" under its fee-shifting provision be interpreted consistently with its meaning under 42 U.S.C. § 1988. *Mitten v. Muscogee Cnty. Sch. Dist.*, 877 F.2d 932, 936 (11th Cir. 1989). The §1988 standard for "prevailing" is whether parent succeeded on any significant issue in the litigation which achieved some of the benefit sought. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).

Plaintiffs here prevailed in the administrative due process hearing as the ALJ ordered that the Defendant "failed to timely locate and evaluate a potentially disabled child, [Plaintiff], resulting in a denial of FAPE." He further ordered that "[Plaintiff] is a prevailing party and entitled to reasonable attorneys' fees." (ECF 28-1, at 39.) Moreover, if this Court reverses the ALJ on the BIP or LRE issues and awards compensatory education, Plaintiffs also will prevail on those issues.

Dated: February 3, 2020                    Respectfully submitted,

                                           */s/ Jodi Siegel*
                                           JODI SIEGEL, Fla. Bar No. 511617
                                           Trial Counsel
                                           jodi.siegel@southernlegal.org
                                           Southern Legal Counsel, Inc.
                                           1229 NW 12th Avenue
                                           Gainesville, FL 32601
                                           (352) 271-8890

                                           SIMONE CHRISS, Fla. Bar No. 124062
                                           simone.chriss@southernlegal.org
                                           Southern Legal Counsel, Inc.
                                           1229 NW 12th Avenue
                                           Gainesville, FL 32601
                                           (352) 271-8890

                                           ALICE K. NELSON, Fla. Bar No. 211771
                                           alice@nelsonkoster.com
                                           Of Counsel
                                           Nelson Koster
                                           c/o 14043 Shady Shores Drive
                                           Tampa, FL 33613
                                           (813) 284-5517

                                           BEVERLY BROWN, Fla. Bar No. 51978
                                           bev.brown@trls.org
                                           Three Rivers Legal Services, Inc.
                                           3225 University Blvd. Suite 220
                                           Jacksonville, Florida 32208
                                           (904) 423-8967 phone
                                           (904)423-8976 fax

                                           **ATTORNEYS FOR PLAINTIFFS**

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on February 3, 2020, I filed the foregoing with the ECF filing system, which served a copy to:

OFFICE OF GENERAL COUNSEL
CITY OF JACKSONVILLE
RITA M. MAIRS
CHIEF, GENERAL LITIGATION
mairsr@coj.net
SONYA HARRELL HOENER
ASSISTANT GENERAL COUNSEL
sonyah@coj.net
117 West Duval Street, Suite 480
Jacksonville, FL 32202
(904) 255-5100

Attorneys for Duval County School Board

*/s/ Jodi Siegel*
**ATTORNEYS FOR PLAINTIFFS**